# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:17-cr-00386-SCJ-RGV |
| | |
| MATTHEW HARRELL | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Matthew Harrell ("Harrell") is charged in a thirty-two count indictment, along with three co-defendants, with conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; healthcare fraud, in violation of 18 U.S.C. § 1347; and aggravated identity theft, in violation of 18 U.S.C. § 1028A. [Doc. 1].[1] Harrell has filed pretrial motions to suppress statements. [Docs. 44 & 53].[2] On May 15, 2018, an evidentiary hearing was held on Harrell's motions to suppress, and the parties indicated that there was no need for further briefing on the motions to

---

[1] The indictment also includes an asset forfeiture provision. [Doc. 1 at 24-25]. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Harrell also has filed a motion for a Kastigar hearing, or alternatively, to dismiss the indictment, [Doc. 65], which will be addressed in a separate Report and Recommendation upon completion of supplemental briefing, see [Doc. 86].

suppress statements.³   See [Doc. 63].   For the reasons that follow, it is **RECOMMENDED** that Harrell's motions to suppress statements, [Docs. 44 & 53], be **DENIED**.

### I.  STATEMENT OF FACTS

In October 2014, Investigator Ralph D. Harper ("Inv. Harper"), of the Georgia Medicaid Fraud Control Unit, was investigating Harrell and his company, Revive Athletics, Inc. ("Revive Athletics"), which purportedly provided counseling services to Medicaid recipients in Georgia, after receiving a referral that identified certain "discrepancies in the billing with Revive Athletics as it pertained to a practitioner that was rendering services for mental health."  (Tr. at 2-4); [Doc. 1 at 3 ¶ 10].  As part of his investigation, Inv. Harper conducted a site visit to Revive Athletics on October 21, 2014, and discovered that the office was closed, the door was locked, and no one was present.  (Tr. at 4).  Inv. Harper spoke with a neighboring tenant, who provided him the name of the building manager, and after speaking with the building manager, he received a phone call from Harrell, who had been notified by the building manager that Inv. Harper was trying to get in touch with him.  (Tr. at 4-5).  During this conversation, Harrell informed Inv. Harper that he was in the process of closing down the Medicaid portion of his business but that he was still

---

³ See [Doc. 84] for the transcript of the evidentiary hearing, and citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at __)."

2

going to operate as a non-profit, and Inv. Harper asked if he could call Harrell back if needed, and Harrell said that he could. (Tr. at 5).

After receiving a voice mail message from Harrell on October 23, 2014, Inv. Harper returned Harrell's phone call the following day, and during this call, which was not recorded, Harrell again explained that he was closing the Medicaid portion of his business, and Inv. Harper told him that he would like to meet with him to discuss some documents he had, and the two agreed to meet that day. (Tr. at 5, 12). Harrell also inquired as to whether he needed an attorney, and Inv. Harper said that "bringing an attorney was entirely his decision" and that if Harrell "met with [him] he was not going to be arrested, and he was free to leave at any time." (Tr. at 5-6).

At approximately 1:00 p.m. on October 24, 2014, Inv. Harper met with Harrell in a large conference room at the offices of the Georgia Medicaid Fraud Control Unit. (Tr. at 6). Chief Investigator Johnny Brooks ("Inv. Brooks") and Investigator Lee Thompson ("Inv. Thompson") also were present for the meeting. (Tr. at 6, 17-18). Harrell was not accompanied by an attorney. (Tr. at 6). During this meeting, which lasted two and a half hours and was not recorded, Harrell made several incriminating statements, which led Inv. Harper to "believe that Medicaid had been billed for services that hadn't been provided which [was] Medicaid fraud." (Tr. at

8-16).[4] At some point during the interview, Inv. Harper left the room for a couple of minutes to take a phone call. (Tr. at 8, 18-19). At this time, Harrell asked Inv. Brooks and Inv. Thompson what he could get in return for his statements, and Inv. Brooks advised him that he "could not make any deals, that he just needed to be honest[.]" (Tr. at 18-19). Also, during the interview, Robin Dykes, an Assistant Attorney General, entered the conference room and Harrell proceeded to make additional statements. (Tr. at 10).

The interview was conducted in a "normal conversation tone," and no one told Harrell he could not leave, and in fact, he was advised that he was free to leave at any time. (Tr. at 8-9, 16, 19-20). The investigators did not display any firearms or use force or physically restrain Harrell in any way, nor did they make any threats or promises to Harrell to induce him to make any statements. (Tr. at 7, 9, 19, 21). Harrell appeared to understand the questions being asked of him, did not appear to be under the influence of any drugs or alcohol, and did not appear to have any mental or physical disability. (Tr. at 7-8, 19). At the conclusion of the interview, Harrell was not arrested and left the offices of the Georgia Medicaid Fraud Control Unit. (Tr. at 11, 16, 22).

---

[4] Inv. Harper testified that Harrell was not advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), because Georgia Medicaid Fraud Control Unit Investigators are not sworn law enforcement officers and do not have the power to arrest. (Tr. at 7, 12, 21-22).

## II. DISCUSSION

Harrell moves to suppress any statements he made to the investigators, arguing that he was "essentially both in custody and [that] to a reasonably prudent person in this position would consider himself in custody." (Tr. at 23). Specifically, Harrell argues that he was "[e]ssentially led into a trap where he walk[ed] into a conference room" and there was a "raid against him" and that it was therefore "not a voluntary interview." (Tr. at 24-25). In response, the government argues that Harrell made "a free and voluntary choice to participate in the interview on October 24th" and that he was simply not in custody. (Tr. at 26).

Harrell initially argues that he was "in custody" for purposes of Miranda advisements. (Tr. at 24). "'*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" United States v. Dudley, Criminal Case No. 1:10–CR–075–CAP–RGV, 2011 WL 1100607, at *4 (N.D. Ga. Feb. 3, 2011), adopted by 2011 WL 1060659, at *1 (N.D. Ga. Mar. 24, 2011) (quoting United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993)). "Custody for purposes of triggering *Miranda* advisements occurs when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. (citation and internal marks omitted). "Whether or not a suspect is in custody prior to his formal arrest

5

depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." Id. (citation and internal marks omitted). "The standard is objective in that the actual subjective beliefs of [the] officer and defendant are irrelevant: custody exists only if a reasonable person under the same set of circumstances would not feel free to leave." Id. (citation omitted). "Thus, [t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings." Id. (alteration in original) (citation and internal marks omitted).

Harrell voluntarily appeared for the interview with the investigators, who had no authority to arrest him, and Harrell was advised he was free to leave at any point, could bring an attorney if he wanted, and that Inv. Harper would not be arresting him if he met with him. (Tr. at 6, 22). Harrell voluntarily came to the Medicaid Fraud Control Unit Office after Inv. Harper received Harrell's voice mail message and returned his call, and they agreed to meet. (Tr. at 4-7, 11, 16, 22). Harrell was not physically restrained nor was his movement restricted in any way during the interview, which took place in a large conference room with windows on two sides of the walls. (Tr. at 6-7, 9, 19, 21). No threats or promises were made to Harrell to induce him to make any statements. (Tr. at 7, 9, 19, 21). At the conclusion of the

interview, Harrell was not arrested and permitted to leave without hindrance. (Tr. at 11, 16, 22).

"There is simply no evidence that [Harrell] was in any manner physically restrained or told that []he had to stay until the questioning had been completed," and "the Court concludes that [Harrell's] freedom of movement was not restrained during [the] interview to the degree associated with a formal arrest. United States v. Donaldson, 493 F. Supp. 2d 998, 1004 (S.D. Ohio 2006); see also United States v. Kidd, CRIMINAL CASE NO. 1:16-CR-00172-AT-JFK, 2016 WL 10704429, at *6 (N.D. Ga. Dec. 7, 2016), adopted by 2017 WL 6520539, at *1 (N.D. Ga. Dec. 19, 2017) (citations omitted) (finding "[n]one of the statements made by the agents during the interview would have led Defendant, who was not physically restrained, to believe that he was in custody," where "[t]he agents did not threaten Defendant and did not refer to or brandish firearms" and "Defendant, who the court [found] voluntarily appeared for the interview, was not told that he was not free to leave but nonetheless could have left at anytime and was advised that he would not be arrested that day and would be contacted in the future about possible charges," and he "was not arrested and, in fact, was not arrested until several months later"). Thus, after consideration of the totality of circumstances, the Court finds that Harrell voluntarily appeared and participated in the meeting and was not in "custody" for

7

purposes of Miranda advisements. Dudley, 2011 WL 1100607, at *5; see also United States v. Williams, No. 3:09-cr-19-MEF, 2010 WL 2595001, at *1 (M.D. Ala. June 24, 2010); United States v. Hargroves, 628 F. Supp. 168, 170 (D. Kan. 1986) (finding defendant was not in custody where he "was summoned by letter and a follow-up phone call," "came to the meeting voluntarily and left freely," "was never placed under arrest, nor was he threatened with arrest," and "[t]he statement he gave was in his own words, and there [was] no allegation that it was 'suggested' to him").

The United States Supreme Court's ruling in Jackson v. Denno, 378 U.S. 368 (1964), governs the voluntariness of confessions, and provides in pertinent part:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

Id. at 376 (internal citation omitted); see also United States v. Stafford, No. CR208-15, 2009 WL 819377, at *2 (S.D. Ga. Mar. 13, 2009), adopted at *1. To be voluntary, a confession must be "the product of an essentially free and unconstrained choice." Culombe v. Connecticut, 367 U.S. 568, 602 (1961). "A confession is not 'voluntary' pursuant to the Due Process Clause when law enforcement officials have used coercive conduct." Stafford, 2009 WL 819377, at *2 (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

"Coercion can be mental or physical," and "[t]he test for determining if a confession is the result of coercion requires a review of the 'totality of the circumstances.'" Id. (citations omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Id. (citations and internal marks omitted); see also Hutto v. Ross, 429 U.S. 28, 30 (1976). "Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment." United States v. Thompson, 422 F.3d 1285, 1296 (11th Cir. 2005). However, "'[a]bsent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law.'" Id. (second alteration in original) (quoting Connelly, 479 U.S. at 164). "'Indeed, far from being prohibited by the Constitution, admissions . . ., if not coerced, are inherently desirable . . . . [and] [a]bsent some officially coerced [testimony], the Fifth Amendment privilege is not violated by even the most damning admissions.'" United States v. Sharma, No. 6:09-CR-1-ORL-19GRJ, 2009 WL 152868, at *8 (M.D. Fla. Jan. 21, 2009), adopted at *1 (alterations in original) (quoting United States v. Washington, 431 U.S. 181, 187 (1977)).

The totality of circumstances in this case reveals that Harrell's statements were not obtained as a result of coercion and were voluntarily given. Specifically, the investigators testified that Harrell voluntarily appeared for the meeting, that they did not make any promises to Harrell in exchange for his statements, and that they did not threaten him in any way. (Tr. at 7, 9, 19-21). And, Inv. Brooks' comment that he could not make any deals, but that Harrell just needed to be honest, (Tr. at 18), does not render Harrell's statement involuntary, see Bradley v. Nagle, 212 F.3d 559, 566 (11th Cir. 2000).

Additionally, there is no evidence that the investigators coerced Harrell into making a statement by threatening him with words or actions. Indeed, the evidence shows that the tone of the interview was conversational, that Harrell was advised that the interview was completely voluntary and that he was free to leave at any time, and that he was never threatened or physically restrained in any way during the interview, which lasted about two and a half hours. (Tr. at 7-9, 19-21).[5] See

---

[5] Harrell suggests that the presence of three investigators and later appearance by an assistant attorney general at the meeting somehow rendered his statements involuntary. (Tr. at 24). However, the Eleventh Circuit has found circumstances where more officers were present not to be coercive. United States v. Edenilson-Reyes, Criminal Action File No. 1:09-CR-00361-RWS-AJB, 2010 WL 5620439, at *14 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011) (collecting cases); see also Stroble v. California, 343 U.S. 181, 190-91 (1952) (confession voluntary where 19 officers were present during a two-hour interrogation in the district attorney's office). Additionally, "[t]here is no evidence of objective coercive police activity," and Harrell has not shown "that his will was

United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *10 (N.D. Ga. Feb. 5, 2010), adopted at *1 (finding statements were voluntarily made where defendant was not physically restrained and was interviewed for a short duration and in the direct presence of only two officers, both of whom spoke in a conversational tone and had their guns holstered throughout the interview). "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Connelly, 479 U.S. at 164). "That type of coercive conduct simply does not exist in this case." Id. In short, "[t]he record is entirely bereft of any evidence that the [investigators] utilized any coercive techniques in this case." United States v. Baskerville, No. CR406-304, 2006 WL 3623533, at *5 (S.D. Ga. Dec. 11, 2006), adopted at *1. Therefore, Harrell's statements are not subject to suppression as the Court finds, under the totality of the circumstances, they were given freely and voluntarily. See United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989).

---

overborne, or that any [] misconduct motivated him to make his incriminating statements." United States v. Sylvester, 330 F. App'x 545, 548 (6th Cir. 2009) (unpublished).

## III.  CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Harrell's motions to suppress statements, [Docs. 44 & 53], be **DENIED**.

**IT IS SO RECOMMENDED**, this 19th day of September, 2018.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE