**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:17-cr-00386-SCJ-RGV |
| | |
| MATTHEW HARRELL | |

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Defendant Matthew Harrell ("Harrell") is charged in a thirty-two count indictment, along with three co-defendants, with conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; healthcare fraud, in violation of 18 U.S.C. § 1347; and aggravated identity theft, in violation of 18 U.S.C. § 1028A. [Doc. 1].[1] Harrell has filed a pretrial motion for a Kastigar hearing,[2] or alternatively, to dismiss the indictment, [Doc. 65], which the government opposes, [Doc. 75].[3] Harrell has filed a reply in support of his motion, [Doc. 78], as well as a supplemental motion,

---

[1] The indictment also includes an asset forfeiture provision. [Doc. 1 at 24-25]. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See Kastigar v. United States, 406 U.S. 441 (1972).

[3] Harrell also filed motions to suppress statements, [Docs. 44 & 53], and these motions have been addressed in a separate Report and Recommendation, see [Docs. 89 & 90].

[Doc. 99], and for the reasons that follow, it is **RECOMMENDED** that Harrell's motion for a <u>Kastigar</u> hearing, or alternatively, to dismiss the indictment, [Doc. 65], and his supplemental motion, [Doc. 99], be **DENIED**.

## I.  STATEMENT OF FACTS

Following an investigation by the Georgia Medicaid Fraud Control Unit that began in 2013, Harrell was indicted in Cobb County Superior Court on November 11, 2014, for Medicaid fraud with respect to his business, Revive Athletics, Inc. ("Revive-GA"). <u>See</u> [Doc. 65 at 1-2]. Around this time, federal authorities were also investigating Harrell and Revive-GA. [<u>Id.</u> at 2]. On June 19, 2015, an Assistant United States Attorney for the Northern District of Georgia sent Harrell's counsel a proffer letter (the "Proffer Agreement"), which states, in relevant part:

> Your client, [] Harrell, is scheduled for a proffer for the purpose of providing information that he may have regarding possible violations of law. This is not a cooperation agreement and this agreement does not apply to any previous statements your client may have made to law enforcement officers. The following terms will govern any proffer session with your client:
>
> 1. The United States Attorney's Office for the Northern District of Georgia (the Government) requires completely truthful statements of your client. Anything related to the Government by you or your client during the proffer cannot and will not be used against him in the grand jury or in the Government's case-in-chief. No statements made by your client during the proffer will be used against your client to increase his offense level pursuant to the Sentencing Guidelines . . . in the pending case. Crimes of violence are excluded from the terms of this paragraph.

2

2.  The Government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against your client in subsequent proceedings.  If your client subsequently takes a position in any legal proceeding that is inconsistent with the proffer–whether in pleadings, oral argument, witness testimony, documentary evidence, questioning of witnesses, or any other manner– the Government may use your client's proffer statements, and all evidence obtained directly or indirectly therefrom in any responsive pleading and argument, and for cross-examination, impeachment, or rebuttal evidence.  The Government may also use statements made by your client in the proffer session(s) to respond to arguments made or issues raised sua sponte by the Magistrate or District Court.  If a plea/cooperation agreement is later reached with your client, and your client violates that plea/cooperation agreement, the United States may use your client's proffer statements during any stage of any prosecution related to the violation of the plea/cooperation agreement including, but not limited to, proceedings before the grand jury, and during all phases of any resulting trial, including the Government's case-in-chief.

3.  If your client willfully makes false or misleading statements during the proffer, your client may be charged with perjury, obstruction of justice, making false statements, or with violating any other applicable criminal statute relating to the giving of false statements.  In such prosecution the Government may use your client's proffer statements, and all evidence obtained directly or indirectly therefrom.  Furthermore, in such prosecution, your client's proffer statements may be used at any stage of the prosecution, including, but not limited to, proceedings before the grand jury, and during all phases of any resulting trial, including the Government's case-in-chief.

4. In agreeing to provide a proffer to the government, your client agrees that the use of any statements or information provided by your client shall be governed by the terms and conditions set forth in this letter agreement.  Furthermore, your client waives any right to challenge the admissibility of any such statements or information under Fed. R. Crim. P. 11 and Fed. R. Evid. 410.

>      5. If this Office receives a request from another prosecutor's office for access to information obtained pursuant to this Proffer Agreement, this Office may furnish such information but will do so only on the condition that the requesting office honor the provisions of this Agreement.
>
>      6. The proffer is to be provided for the purpose of allowing the Government to assess the credibility and value of the evidence and possible testimony that we believe your client can provide. Please understand in this regard that at this juncture your client is not entitled to any specific consideration regarding the disposition of charges currently pending against him solely because he will have given this proffer.
>
>      7. No promises, agreements, or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties. This agreement supersedes any prior promises, agreements or conditions between the parties.

[Doc. 75-1 at 1-2 (emphasis omitted)].

Pursuant to the Proffer Agreement, Harrell and his counsel met with law enforcement agents on June 26, 2015, for a proffer session. [Doc. 65 at 2]. The Cobb County Superior Court subsequently dismissed the indictment against Harrell on October 9, 2015, and a second proffer session with Harrell and his counsel occurred on October 30, 2015. [Id.; Doc. 65-2].[4] On June 21, 2016, Harrell was indicted along

---

[4] On January 27, 2016, a Florida investigator presented an affidavit to establish probable cause that Harrell, and others, conspired to commit Medicaid fraud and committed Medicaid fraud, as well as made criminal use of personal identification information. See [Doc. 65-3]. Harrell points out that the probable cause affidavit "quotes excerpts of statements [he] made . . . during the proffer in the NDGA contained in the proffer memorandum[.]" [Doc. 65 at 8-9 (citation omitted)]. He

with seven co-defendants in the Northern District of Georgia on charges relating to conspiracy to commit health care fraud with respect to Jode Counseling and Training Services, LLC ("Jode"). See United States v. Shannon, Criminal Case No.: 1:16-cr-00218-LMM-RGV, at [Doc. 1] (N.D. Ga. June 21, 2016). On April 10, 2017, the government dismissed the charges against Harrell in that indictment, see id. at [Doc. 155], and on November 7, 2017, a grand jury returned the current indictment against Harrell and his co-defendants on charges related to four of his companies, Revive-GA, R.A. Inc. Florida ("Revive-FL"), Revive Athletics, Inc. ("Revive-LA"), and Jode, [Doc. 1].

## II. DISCUSSION

Harrell moves the Court to conduct a Kastigar hearing, or in the alternative, to dismiss the instant indictment, arguing that the government violated the terms of the Proffer Agreement by making direct and derivative use of the statements he made at the two proffer sessions. [Doc. 65]. Specifically, Harrell asserts that the language of the Proffer Agreement is ambiguous and should be construed against the government, thereby prohibiting both the direct and derivative use of his

---

also points out that agents "set up multiple controlled calls and a meet by L.W.," a licensed clinical social worker who "first became known to investigators through [] Harrell during his October 30th proffer," with Harrell "to entrap [him]." [Id. at 9 (citation omitted)]. Based on the affidavit, an arrest warrant was issued by the State of Florida, but the charges in Florida subsequently were dismissed. [Id.].

statements. [Id. at 4-5]. Harrell contends that he has "legitimate concerns that information given in his proffer(s) was used against him at the grand jury level" and that "use of the proffer . . . by another agency [in Florida] has cast serious suspicion on what information was used directly or derivatively from the proffer in the current case, particularly concerning what was presented to the grand jury," since "[n]either Revive-FL nor Revive-LA were ever mentioned in the first Cobb County, Georgia indictment, nor the first federal indictment in the NDGA." [Id. at 8-10]. Harrell therefore maintains that a hearing pursuant to Kastigar "is necessary to determine whether the government made direct use of [his] statements given under the proffer agreement." [Id. at 10].

The Fifth Amendment "bars the compelled disclosure of self-incriminating information unless the government first grants the witness [i]mmunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom." In re Sealed Case, 686 F.3d 799, 801 (D.C. Cir. 2012) (alteration in original) (citation and internal marks omitted). "In Kastigar, the Supreme Court held that a government entity seeking to prosecute a witness who has been immunized under the federal immunity statute . . . has the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." Duarte v. United States, CASE NO.

12-22012-Civ-LENARD, 2013 WL 12202487, at *20 n. 13 (S.D. Fla. Mar. 20, 2013), adopted by 2014 WL 12690490, at *7 (S.D. Fla. May 20, 2014) (internal citation and internal marks omitted). However, "[t]here is nothing in this recitation of fundamental principles that benefits [Harrell] for the simple reason that the government did not compel him to provide any incriminating information; he did so voluntarily pursuant to the [Proffer] [A]greement," and this agreement "alone determines the scope of [Harrell's] immunity[.]" In re Sealed Case, 686 F.3d at 801-02 (citation omitted). Thus, Harrell's arguments require the Court to first review the scope of immunity granted pursuant to the Proffer Agreement,[5] which "is governed generally by the principles of contract law," United States v. Pielago, 135 F.3d 703,

---

[5] "Witness immunity generally is characterized as either transactional immunity or use and derivative use immunity." United States v. Quatermain, Drax, 613 F.2d 38, 40 (3d Cir. 1980). "Transactional immunity accords full immunity from prosecution for the offense to which the compelled testimony relates," whereas "[u]se and derivative use immunity prohibits the use of compelled testimony or any evidence derived from that testimony against the witness in a criminal prosecution." Id. (citation and internal marks omitted). "'Use immunity' can mean that the communicant is protected against only direct use of his communication; or, it can mean that he is protected against even 'indirect' use under a concept generally called 'derivative use immunity.'" United States v. Kilroy, 27 F.3d 679, 685 (D.C. Cir. 1994). "Statutory immunity under [18 U.S.C.] § 6002 includes derivative use," but "[t]he fact that the statute affords derivative use immunity does not [] compel a conclusion that the [proffer] agreement afforded more than a direct use immunity." Id.; see also United States v. Smith, 452 F.3d 323, 336-37 (4th Cir. 2006) (footnote and citations omitted) ("Use immunity prevents the prosecution from directly utilizing immunized testimony itself; derivative use immunity is broader, and additionally precludes the use of evidence that may be derived therefrom.").

709 (11th Cir. 1998) (citations omitted); see also United States v. Mathis, 239 F. App'x 513, 515 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted), and "[a]ny ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant," United States v. Artis, 261 F. App'x 176, 178 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted).

The relevant paragraphs of the Proffer Agreement provide that "[a]nything related to the Government by [Harrell's counsel] or [Harrell] during the proffer cannot and will not be used against [Harrell] in the grand jury or in the Government's case-in-chief," but that the "Government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against [Harrell] in subsequent proceedings." [Doc. 75-1 at 1]. The Proffer Agreement further provides that if the United States Attorney's Office for the Northern District of Georgia "receives a request from another prosecutor's office for access to information obtained pursuant to this Proffer Agreement, [it] may furnish such information but will do so only on the condition that the requesting office honor the provisions of this Agreement." [Id. at 2].

Harrell, relying on United States v. Hill, 643 F.3d 807 (11th Cir. 2011), asserts that the language in the Proffer Agreement is ambiguous and confusing, and that

8

construing the agreement against the government, leads to the conclusion that "derivative evidence cannot be used by the Government in its case-in-chief, nor was it allowed to be used by the government in the grand jury indictment proceedings[.]" [Doc. 65 at 5-7]. Notwithstanding Harrell's arguments to the contrary, the language of the proffer agreement in Hill is distinguishable from the agreement in this case, as Harrell concedes in his reply. See [Doc. 78 at 6].

In Hill, one of the defendants had entered into a proffer agreement with the government, which provided that "[a]nything related to the proffer [could not] and [would] not be used against [defendant] in any Government case-in-chief," but "the Government [was] completely free to pursue any and all investigative leads derived in any way from the proffer." 643 F.3d at 875 (emphasis omitted). The Eleventh Circuit found that the "two sentences . . . point in opposite directions" and discussed that "'related to the proffer'" as used in the first part of the agreement was a "broad" phrase and that "evidence developed using the information he proffered [was] 'related to' the proffer." Id. (citations omitted). Thus, the Eleventh Circuit construed the ambiguities against the government and ruled that "the government was not entitled to use derivative evidence against [defendant]." Id. at 875-76. In reaching its decision, however, the Eleventh Circuit specifically cited other proffer agreements that expressly and clearly reserved the right to use derivative evidence,

9

including language that "the government 'reserves the right to pursue any and all investigative leads derived from statements and information and to use such derivative evidence in any criminal or civil proceeding against [defendant] and others," and stated that these other agreements showed "that the government kn[ew] how to clearly and expressly reserve the right to make derivative use of proffered information against the one supplying it when the government want[ed] to do so." Id. at 876 (citation and internal marks omitted).

The Proffer Agreement in this case is distinguishable from the ambiguous "related to the proffer" language at issue in Hill and more akin to those proffer agreements cited by the Eleventh Circuit as properly reserving the right to make derivative use of proffered statements. See id. (citing United States v. Schwartz, 541 F.3d 1331, 1355 (11th Cir. 2008); Pielago, 135 F.3d at 710). The Proffer Agreement here prohibits use in the grand jury and in the government's case-in-chief of "[a]nything related to the Government by [Harrell's counsel] or [Harrell] during the proffer," [Doc. 75-1 at 1], which, as the government points out, "includes only statements made to the government in the course of the proffer," whereas the language at issue in Hill "include[d] not only statements made in the proffer, but also anything related to statements made in the proffer," which was much broader and incongruent with the second part of the proffer agreement that attempted to

preserve derivative use, [Doc. 75 at 10]. In contrast, Harrell's Proffer Agreement provides only that the government agreed not to use any statements made by Harrell or Harrell's counsel against Harrell in the grand jury or in the government's case-in-chief. See [Doc. 75-1 at 1]. The government then clearly and expressly reserved its right to "pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against [Harrell] in subsequent proceedings." [Id.].[6]

---

[6] Harrell contends that the inclusion of the phrase "in subsequent proceedings" in the first sentence of the second paragraph of the Proffer Agreement renders the agreement ambiguous because the second sentence of that paragraph states that if he "'subsequently takes a position in any legal proceeding . . . inconsistent with the proffer. . .,' the Government can use [his] proffer statements and all evidence obtained directly or indirectly from the statement 'in any responsive pleading and argument . . . for cross-examination, impeachment, or rebuttal evidence.'" [Doc. 65 at 6 (all but third alteration in original) (emphasis omitted)]. Harrell asserts that the omission of any mention of using his proffered statements and evidence derived therefrom in the grand jury and in the government's case-in-chief in the second sentence of the second paragraph means that the government did not reserve the right to make derivative use of his proffered statements in those circumstances and distinguishes his Proffer Agreement from the agreement in Pielago, relied on by the government. [Doc. 78 at 3-4, 7-8]. However, Harrell's argument is without merit as the second sentence of the second paragraph does not limit the derivative use reserved in the first sentence of that paragraph, but merely specifies circumstances in which the government may respond to and rebut statements Harrell makes that are inconsistent with his proffered statements, and there would be no point in mentioning the grand jury in the second sentence since the government simply presents testimony and evidence to the grand jury to establish probable cause for securing an indictment and does not offer a response or rebuttal evidence in the grand jury. Likewise, the government's case-in-chief is not mentioned in the second sentence because the sentence concerns responsive and rebuttal evidence.

Harrell's attempt to gloss over the distinction between the ambiguous "related to the proffer" language in Hill and the "related to the Government by you or your client" provision in his Proffer Agreement is unpersuasive, and the Court does "not believe that the two paragraphs, when properly construed, conflict." Pielago, 135 F.3d at 710. That is, "[b]oth paragraphs describe the government's right to use evidence acquired from [Harrell's] proffer" and when the paragraphs are "read together," the Proffer Agreement "prohibits the government from directly using [Harrell's] statements . . . against [him in the grand jury or in the government's case-in-chief]," while "correspondingly allow[ing] the government to use evidence derived from [his] proffer statements against [him]." Id. Thus, a Kastigar hearing is "not required in this case because, at most, the government provided [Harrell] with use immunity, not derivative use immunity." United States v. Short, 387 F. App'x 308, 314 n.3 (4th Cir. 2010) (unpublished) (citation omitted).[7]

---

[7] Harrell points out that statements from his second proffer were used in a probable cause affidavit in support of a charging information in the State of Florida, which led to the issuance of a warrant for his arrest, and he argues that the use of his statements in this regard was in direct violation of the Proffer Agreement. [Doc. 65 at 8-9]. The Proffer Agreement specifically states that if the United States Attorney's Office for the Northern District of Georgia receives "a request from another prosecutor's office for access to information obtained pursuant to this Proffer Agreement, [it] may furnish such information but w[ould] do so only on the condition that the requesting office honor the provisions of th[e] Agreement," [Doc. 75-1 at 2]. The government concedes that, while not explicitly prohibited by the Proffer Agreement, a court could conclude that the use of Harrell's proffered statements in the Florida prosecution constituted a violation of the Proffer

While the Court finds that the Proffer Agreement only provided Harrell with limited direct use immunity and not derivative use immunity, the Court must still consider whether his statements from either proffer session were used in the grand jury proceedings that resulted in the instant indictment. As noted, the Court has received and reviewed *in camera* the testimony presented to the grand jury, [Doc. 87-32], as well as an affidavit filed under seal, [Doc. 88-1], and reports of interviews conducted by agents during the investigation of this case, [Docs. 87 & 88], and based on a review of these materials, the Court identified two statements made during the grand jury testimony that were based on information provided by Harrell during one of his proffer sessions.[8] Specifically, the two statements pertain to an alleged

---

Agreement in that jurisdiction, [Doc. 75 at 11], but the government asserts that it can demonstrate that it did not use Harrell's proffered statements in the grand jury and does not intend to use his statements in its case-in-chief at trial, and therefore, it has not breached the Proffer Agreement, [id. at 11-12], and it has provided for the Court's *in camera* review the testimony presented to the grand jury to obtain the instant indictment as well as copies of reports of interviews conducted by agents during the investigation of this case. See [Docs. 87 & 88 (under seal)]. As discussed hereinafter, the Court has reviewed *in camera* these materials, as well as an affidavit and supplemental documents filed under seal, and subsequently ordered that the transcript of the grand jury testimony be produced to Harrell's counsel.

[8] Upon initial review of the grand jury testimony and the reports of interviews provided by the government, see [Doc. 87], the Court identified four excerpts from the grand jury testimony that appeared to correspond to information provided during Harrell's proffers that could not be attributed to the reports of interviews provided for *in camera* review. Accordingly, the Court directed the government to file an affidavit under seal identifying the source of the information identified in the excerpts from the grand jury testimony. See [Doc. 85]. The government

13

financial arrangement between Harrell and A.B., whose name and identifying information were used to enroll Jode as a Medicaid provider.[9]  Upon identifying these statements, the Court conducted a telephone conference call with Harrell's counsel and the prosecutor and identified these two statements in the grand jury transcript by page and line number and ordered that the grand jury transcript be provided to Harrell's counsel for his review.  See [Doc. 86].  The Court provided Harrell the opportunity to review the entire grand jury transcript and to identify any other statements in the grand jury testimony that he contends were from his proffers.  [Id.].  The Court instructed Harrell to file a supplement to his Kastigar motion, identifying all statements that he contends were from his proffers and to cite supporting authority for his contention that use of the statements constituted a material breach of the proffer agreement and to specify the relief he sought based on the alleged breach.  [Id.].

---

subsequently submitted the affidavit, along with additional reports of interviews and documents obtained during the investigation that had not previously been provided to the Court. See [Doc. 88]. Upon review of these supplemental materials, the Court identified only the two statements in question as information obtained from Harrell's first proffer session on June 26, 2015.  See [Doc. 86].

[9] The two statements were:  (1) "And basically Mr. Harrell offered him, well, we'll pay you $5,000 a month"; and (2) "And then you'll receive a fee every month for – as Mr. Harrell's partner, so to speak."  [Doc. 87-32 at 12].

On November 2, 2018, Harrell filed his supplemental motion, [Doc. 99], arguing that the government's use of the two statements in the grand jury testimony identified by the Court that came from his first proffer session constituted a material breach of the Proffer Agreement and seeking dismissal of the entire indictment or, in the alternative, dismissal of Counts 14-20, which pertain to Jode, [id.].[10] Harrell did not identify any other statements in the grand jury testimony that he contends came from his proffer sessions, nor did he cite any authority to support his position that use of the two statements in question constituted a material breach of the Proffer Agreement warranting dismissal of the indictment. See generally [id.].

The Court finds that the use of these two statements breached the terms of the Proffer Agreement, but because there is no indication that these statements were

---

[10] Harrell incorrectly asserts in his supplemental motion that the Court found, and the government conceded, that the testimony regarding Jode and how it was set up was not independently corroborated by any extrinsic evidence. [Doc. 99 at 2]. The only two statements the Court identified that were based on information provided by Harrell during his first proffer session concerned the amount and terms of payments Harrell allegedly made to A.B., and these statements were identified at lines 9-10 and 15-17 of page 12 of the transcript. [Doc. 86; Doc. 87-32 at 12]. Harrell has not specified by page and line number any other statements in the grand jury testimony that he contends came from either of his proffer sessions. See generally [Doc. 99]. Moreover, the government had evidence independent of Harrell's proffer regarding Jode and how it was set up, including evidence of Harrell's making payments to A.B., see [Doc. 87-10 at 5]; however, the government acknowledged that the two statements in the grand jury testimony identified by the Court regarding the specific financial agreement and amount of the payment correspond to Harrell's proffer rather than an independent source, [Doc. 86; Doc. 88-1 at 3-4].

material to any of the charges in the indictment returned by the grand jury, their use was harmless and there was no material breach warranting the relief of dismissing the indictment, in whole or in part, as requested by Harrell. United States v. Byrd, 765 F.2d 1524, 1529 n.8 (11th Cir. 1985); see also United States v. Mendizabal, 214 F. App'x 496, 502 (6th Cir. 2006) (unpublished). The two statements concerned an alleged financial arrangement between Harrell and A.B. for Harrell's use of A.B.'s name and identifying information in connection with opening and operating Jode, but these statements from Harrell's proffer about making payments to A.B. are not mentioned in the indictment. See generally [Doc. 1]. Indeed, the only reference to A.B. appears in a single paragraph of the indictment. See [id. at 13 ¶ 47]. Count 14 of the indictment charges a conspiracy to commit health care fraud with respect to Jode, and alleges that "[t]he Jode application represented that A.B., an associate of [] Harrell, was the purported owner of Jode," when in fact, "A.B. had no experience in mental health services and had merely given his name, Social Security number, and other identifiers to [] Harrell to be used for the Jode application." [Id. (all caps omitted)]. The government had a source of information for each allegation in this paragraph of the indictment independent of Harrell's proffer, and the two statements about payments Harrell allegedly made to A.B. are not material to the conspiracy charged in Count 14 or to any of the other charges in the indictment

pertaining to Jode. Whether Harrell paid A.B. for use of his name and personal identifying information, as Harrell said in his proffer, or A.B. merely gave this information to Harrell to be used for the Jode application, as alleged in the indictment, is simply not material to the grand jury's finding of probable cause that Harrell conspired to obtain funds from Medicaid under false pretenses by submitting "a fraudulent application for Jode to obtain a Georgia Medicaid provider number, based upon false information and falsified documents," and subsequently presenting "fraudulent claims to Medicaid for reimbursement." [Id. at 12 ¶ 43]. In other words, the material and relevant conduct charged in the indictment involved the submission of false information and false claims to Medicaid for which the government had evidence independent of Harrell's proffer, and the two statements that Harrell paid A.B. were not necessary to establish probable cause to support the conspiracy charged in Count 14, or for any of the other counts in the indictment pertaining to Jode. See United States v. Curry, No. 3:05 CR 10 JORDAN, 3:05 CR 10 GUYTON, 2005 WL 2100651, at *5 (E.D. Tenn. July 14, 2005), adopted by 2005 WL 2060770, at *2 (E.D. Tenn. Aug. 17, 2005) (finding that while "one piece of information presented to the grand jury could have possibly come from the defendant's proffer," this "piece of information was not material to the charges against the defendant and, therefore, if it did come from the proffer, [was] not a

17

material breach of the . . . agreement"); see also Pielago, 135 F.3d at 708 (finding dismissal of indictment not warranted where government made use of immunized statement from proffer session in grand jury testimony that led to the superseding indictment modifying the conspiracy count since defendant "does not challenge the validity of the conspiracy count," nor "does she contend that there would have been a material variance between the proof and the indictment if that count had not been modified" because "[e]ither way, she was still on the hook for her participation in the conspiracy" and the "change of the indictment did not prejudice her"); Byrd, 765 F.2d at 1529 n.8 (citation omitted) (quoting United States v. Gregory, 730 F.2d 692, 698 (11th Cir. 1984)) (noting that even if the evidence showed that defendant's "immunized testimony" was incorporated into "summaries of the testimony of the other witnesses, the indictment must nevertheless be sustained 'if use of the prohibited evidence is found to be harmless'"); United States v. Vander Luitgaren, 556 F. Supp. 2d 1313, 1318-19 (M.D. Fla. 2008) (citation omitted) (finding presentation of three pieces of immunized evidence to grand jury consisting of defendant's "side of the story" exculpating him was "at most harmless error and therefore [did] not invalidate the indictment"). Accordingly, because Harrell has not

shown that there was a material breach of the Proffer Agreement, his motion to dismiss the indictment is due to be denied.[11]

---

[11] Even if the Court were to find that the government materially breached the Proffer Agreement by presenting testimony to the grand jury in two statements about Harrell paying A.B., the drastic relief Harrell seeks of dismissing the entire indictment would be entirely disproportionate to that breach. Indeed, even his alternative request for relief that all charges pertaining to Jode be dismissed would be unwarranted. See United States v. Fuller, 149 F. Supp. 2d 17, 22 (S.D.N.Y. 2001) (emphasis, citation, and internal marks omitted) (finding "the appropriate remedy for the improper use of immunized testimony before the grand jury [was] the suppression of the tainted evidence at trial, not dismissal of the indictment"); see also Pielago, 135 F.3d at 707-08 & n.1 (declining to adopt the Second Circuit's per se rule that an indictment must be dismissed as to any defendant whose immunized statement was heard by the grand jury and finding dismissal inappropriate where defendant was not prejudiced). As previously discussed, A.B. is mentioned in only one paragraph of Count 14, which charges a conspiracy to defraud Medicaid in violation of 18 U.S.C. § 1349 by submitting "a fraudulent application for Jode to obtain a Georgia Medicaid provider number, based upon false information and falsified documents," and subsequently presenting "fraudulent claims to Medicaid for reimbursement." [Doc. 1 at 12 ¶ 43]. Putting aside the statements about the amount of Harrell's payments to A.B., there was ample untainted evidence presented to the grand jury to support probable cause for the conspiracy charged in Count 14. The remaining counts related to Jode are even more attenuated from the statements about payments to A.B. Counts 15 through 19 of the indictment charge health care fraud in violation of 18 U.S.C. § 1347 based on specific false claims allegedly submitted to Medicaid for services that were not provided and were not entitled to reimbursement by Medicaid. [Id. at 16 ¶ 58]. And, Count 20 charges aggravated identity theft in violation of 18 U.S.C. § 1028A based on the use of the Medicaid provider number of C.B. [Id. at 17 ¶ 60]. Despite being provided the opportunity to do so in his supplemental motion, Harrell has not identified any lesser form of relief for the breach of the Proffer Agreement than dismissal of charges that are plainly supported by untainted evidence, so his motion to dismiss the indictment is due to be denied for these additional reasons.

## III. CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Harrell's motion for a Kastigar hearing, or alternatively, to dismiss the indictment, [Doc. 65], and his supplemental motion, [Doc. 99], be **DENIED.**

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO RECOMMENDED**, this 9th day of November, 2018.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE